United States District Court
Southern District of Texas
**ENTERED**
March 31, 2017
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| SARIJINI LEVINE, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 3:12-CV-186 |
| | § | |
| DR. J. TAYLOR, *et al.*, | § | |
| | § | |
| Defendants. | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Sarijini Levine, a prisoner in the custody of the Texas Department of Criminal Justice ("TDCJ"), has filed a *pro se* civil rights complaint and is proceeding *in forma pauperis* (Dkt. 1, Dkt. 8). She initially sued 11 defendants under 42 U.S.C. § 1983, bringing claims of Constitutionally deficient medical care stemming from cataract surgery. The Court transferred the claims against eight of the defendants to the Waco Division of the Western District of Texas (Dkt. 6), where they were dismissed for failure to prosecute. *See* Western District of Texas Case Number 6:12-CV-185 at Dkt. 25. The claims against three defendants remain here. One of those defendants, Dr. Ghassan Ghorayeb, performed the cataract surgery at the University of Texas Medical Branch at Galveston ("UTMB"). The other two, Dr. Joe Taylor and Robert Knoth, PA, helped provide post-operative care to Levine at TDCJ's Carole Young Medical Facility ("CYMF"), where Levine was housed for about three weeks.

The Court requested a *Martinez* report[1] from the Texas Attorney General's office, which the Attorney General's office provided on behalf of Dr. Taylor and Knoth (Dkt. 16, Dkt. 17). Dr. Ghorayeb provided his own *Martinez* report (Dkt. 14). The Court construed the *Martinez* reports as motions for summary judgment and notified Levine of that construction (Dkt. 18). Levine responded (Dkt. 23 and Dkt. 26). The Court will also consider Levine's original complaint and its attachments to be part of the summary judgment record because Levine declared under penalty of perjury that the facts set forth in the complaint and attachments are true and correct (Dkt. 1 at p. 5; Dkt. 1-6 at p. 14). *See Hart v. Hairston*, 343 F.3d 762, 765 (5th Cir. 2003) ("On summary judgment, factual allegations set forth in a verified complaint may be treated the same as when they are contained in an affidavit."); *see also Davis v. Hernandez*, 798 F.3d 290, 293 (5th Cir. 2015) ("[F]ederal courts, this one included, have a traditional disposition of leniency toward *pro se* litigants.") (quotation marks omitted).

After reviewing all of the evidence submitted, the parties' briefing, and the applicable law, the Court concludes that the defendants' motions for summary judgment must be **GRANTED** for the reasons that follow.

## I.    BACKGROUND

Levine had cataract surgery on her right eye on June 18, 2010. Although she was incarcerated at TDCJ's Lane Murray Unit—which is located in the Waco Division of the Western District, hence the Court's transfer of most of her claims there—her surgery took

---

[1]     *Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1987); *see also Cay v. Estelle*, 789 F.2d 318, 323 & n.4 (5th Cir. 1986) (discussing the utility of a *Martinez* report).

place at UTMB; and she spent about three weeks recovering post-surgery at UTMB and CYMF. Levine was in her early sixties at the time and had been diagnosed with several serious medical conditions, including hypertension, coronary atherosclerosis, hypothyroidism, and diabetes (Dkt. 16-1 at p. 41). She also suffered a back injury in 1991 (Dkt. 14-1 at p. 3; Dkt. 16-1 at p. 14; Dkt. 23 at p. 2).

Dr. Ghorayeb, an ophthalmology resident at UTMB, performed the cataract surgery; he was supervised during the procedure by Dr. Manuj Kapur, a UTMB faculty member (Dkt. 16-1 at pp. 13–14; Dkt. 14-6 at pp. 2–3). The surgery was unremarkable except for the discovery during the procedure that Levine had a condition called Intraoperative Floppy Iris Syndrome ("IFIS") (Dkt. 16-1 at pp. 13–14). According to a joint advisory released in 2014 by the American Academy of Ophthalmology and the American Society of Cataract and Refractive Surgery,[1] IFIS leads to poor dilation and sudden constriction of the pupil during cataract surgery, "which increases the difficulty and risk" associated with that surgery. The joint advisory explains that IFIS was first reported in the medical literature in 2005 and is primarily associated with the use of "alpha-blocker" drugs, such as Flomax, that are typically prescribed to men to treat frequent urination associated with prostate enlargement (though the drugs are also sometimes prescribed to treat urinary retention in women as well). There is no claim or evidence that Levine was taking any such drugs. The joint advisory notes that IFIS does

---

[1]

http://www.ascrs.org/sites/default/files/resources/Flomax%20Patient%20Advisory%20revision_JH_3%20FINAL_FL%20DC%20edited.pdf

not preclude cataract surgery and is not itself a surgical complication; it is simply a preexisting condition that may require the surgeon to modify his or her surgical technique. These statements are in line with the testimony of Dr. Ghorayeb's medical expert, whose affidavit explains that IFIS "is not considered an intraoperative complication" and "in no way indicates substandard surgical technique" (Dkt. 14-1 at p. 3). Dr. Ghorayeb worked around the IFIS, and his operative report notes that there were "no immediate complications" with the surgery and that Levine "tolerated the procedure well" (Dkt. 16-1 at p. 14). Dr. Ghorayeb prescribed Tylenol for pain, Vigamox drops to prevent infection, and Pred Forte and Ocufen drops to combat inflammation (Dkt. 14-5 at p. 25).

Levine spent the next few days at UTMB. On June 19, 2010, the day after her surgery, she was evaluated at a follow-up appointment (Dkt. 14-5 at p. 44). Levine reported light pain (she rated it a one on a scale of one to ten) and some nausea (Dkt. 14-5 at p. 44). Overall, she was "doing well[,]" and another follow-up appointment was scheduled for June 24, 2010 (Dkt. 14-5 at pp. 39, 44). Her prescriptions from the previous day were continued, and a prescription for Phenergan was added to treat the nausea (Dkt. 14-5 at pp. 24, 44).[2] She was prohibited from lifting over five pounds or engaging in any strenuous activity; told to keep "dirty, soapy water" out of her eyes; told to cover her

---

[2]    It is not clear, and not particularly relevant, who conducted this follow-up evaluation and prescribed the Phenergan. There is no legible signature on the medical chart, and Dr. Ghorayeb has no independent recollection of the June 19, 2010 visit (Dkt. 14-6 at p. 3). Levine seems to think that it was Dr. Ghorayeb (Dkt. 23 at pp. 5–6). The handwriting and beeper number on the Phenergan prescription appear to belong to a Dr. Kaplowitz, whom Levine never mentions (Dkt. 14-5 at p. 24; Dkt. 16 at p. 24).

right eye with an eye shield and tape while sleeping; and instructed to notify medical personnel if she experienced "fever, redness, pain, or any vision changes [in her] operative eye" (Dkt. 14-5 at p. 39). She acknowledged receipt and expressed understanding of the instructions (Dkt. 14-5 at p. 40). Aside from the nausea and the one-out-of-ten pain, Levine did not voice any concerns to UTMB personnel in the few days immediately after her surgery, and she did not appear to be in acute distress during that time (Dkt. 14-5 at p. 48).

On June 22, 2010, Levine was transferred from UTMB to CYMF. On that day, she complained of eye pain and was evaluated by Knoth at the CYMF clinic (Dkt. 16 at pp. 14, 82). Knoth saw "no redness or edema" and observed that Levine's lens was clear and her eye movements were intact (Dkt. 16 at p. 14). Knoth "reassur[ed]" Levine and outlined his intention to "[continue with] eye drops as ordered by [UTMB]" (Dkt. 16 at p. 14). Knoth told Levine to return to the CYMF clinic as needed during her stay there (Dkt. 16 at p. 14).

Levine missed her June 24, 2010 follow-up appointment at UTMB; it is unclear why. Knoth and Dr. Taylor have provided an affidavit from the Legal Coordinator of the Correctional Managed Care division of UTMB, and the affidavit states that Levine "was chained out to [UTMB] for her follow-up appointment [on June 24] but there are no records indicating why [Levine] was not seen" (Dkt. 17-1 at p. 3). The CYMF records also indicate that Levine was "chained to [UTMB]" (Dkt. 16 at p. 82). Levine makes the conclusory allegation that Knoth and Dr. Taylor "denied" or "delayed" the appointment

but does not controvert the testimony and evidence showing that she was chained out for it (Dkt. 1 at p. 3; Dkt. 1-6 at p. 8).

On June 30, 2010, Levine again complained of eye pain and went to the CYMF clinic, where Dr. Taylor evaluated her eye (Dkt. 16 at pp. 13, 82). Dr. Taylor conducted a funduscopic examination, which was unremarkable and revealed no redness or edema to the conjunctiva (Dkt. 16 at p. 13). Levine told Dr. Taylor that she was "[w]orrying" about her next follow-up appointment at UTMB, which was scheduled for July 5, 2010 (Dkt. 16 at pp. 13, 82). Dr. Taylor "[e]ncouraged" Levine to keep her scheduled follow-up appointment and advised her to continue using her prescribed eye drops (Dkt. 16 at p. 13).

Levine complained again of eye pain on July 5, 2010 (Dkt. 16 at p. 82). Her medical records indicate that she was not seen at CYMF on that date because she was scheduled to go to UTMB for a follow-up appointment (Dkt. 16 at p. 82). Levine went to her appointment at UTMB on July 5, 2010 (Dkt. 16 at pp. 25, 26). At that appointment, she complained of pain, decreased visual acuity, and shadowy vision (Dkt. 16 at pp. 25, 26). She reported compliance with her medications and was in no apparent distress (Dkt. 16 at pp. 25, 26). A follow-up appointment was scheduled for July 12, 2010; and Levine was advised to continue using her eye medication as directed (Dkt. 16 at p. 26). Her medications were changed: the Vigamox was discontinued (Dkt. 16 at pp. 26, 27). The Pred Forte and Ocufen prescriptions were continued (Dkt. 16 at pp. 26, 27). Levine verbalized understanding of the treatment plan (Dkt. 16 at p. 26).

Levine did not voice any other complaints to CYMF personnel during her time at CYMF (Dkt. 16 at p. 82). She went to her follow-up appointment at UTMB on July 12, 2010 (Dkt. 16 at pp. 22, 23). At that appointment, she complained of some discomfort and sensitivity to light (Dkt. 16 at p. 22). She was given a sunglass pass for six months; and the Pred Forte and Ocufen prescriptions were continued, to be "fill[ed] at [her] unit" (Dkt. 16 at p. 23). She expressed understanding of this treatment plan (Dkt. 16 at p. 23). On either July 12 or July 13, 2010, Levine was transferred back to the Lane Murray Unit (Dkt. 1-2 at p. 3; Dkt. 17-1 at p. 4).

## II.    THE   PLRA,   SUMMARY   JUDGMENTS,   AND   QUALIFIED IMMUNITY

### A.    The PLRA

The complaint in this case is governed by the Prison Litigation Reform Act (the "PLRA").  Upon initial screening of a prisoner civil rights complaint, the PLRA requires a district court to scrutinize the claims and dismiss the complaint, in whole or in part, if it determines that the complaint "is frivolous, malicious, or fails to state a claim upon which relief may be granted;" or "seeks monetary relief from a defendant who is immune from such relief."  28 U.S.C. § 1915A(b).  A reviewing court may dismiss a complaint for these same reasons "at any time" where a party, like Levine, proceeds *in forma pauperis*. 28 U.S.C. § 1915(e)(2)(B) (mandating dismissal where the complaint is "frivolous or malicious," "fails to state a claim upon which relief may be granted," or "seeks monetary relief from a defendant who is immune from such relief").  The PLRA also provides that the court "shall on its own motion or on the motion of a party dismiss an action" if it is

satisfied that the complaint is "frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief." 42 U.S.C. § 1997e(c).

Levine proceeds *pro se* in this case.   Courts construe pleadings filed by *pro se* litigants under a less stringent standard of review. *Haines v. Kerner*, 404 U.S. 519 (1972) (per curiam). Under this standard, "[a] document filed *pro se* is 'to be liberally construed,' *Estelle* [*v. Gamble*, 429 U.S. 97, 106 (1976)], and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).   Nevertheless, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (observing that courts "are not bound to accept as true a legal conclusion couched as a factual allegation").   The Supreme Court has clarified that "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

### B.   Rule 56

The defendants have filed *Martinez* reports, which the Court has construed as motions for summary judgment. Federal Rule of Civil Procedure 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party

who fails to make a sufficient showing of the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding a motion for summary judgment, the Court must determine whether the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *Id.* at 322–23.

For summary judgment, the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an absence of a genuine issue of material fact. *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). The movant, however, need not negate the elements of the non-movant's case. *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). The movant may meet its burden by pointing out the absence of evidence supporting the non-movant's case. *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 312 (5th Cir. 1995).

If the movant meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (citations omitted).

In deciding whether a genuine and material fact issue has been created, the facts and inferences to be drawn from those facts must be reviewed in the light most favorable

to the non-movant. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003). However, factual controversies are resolved in favor of the non-movant "only when both parties have submitted evidence of contradictory facts." *Alexander v. Eeds*, 392 F.3d 138, 142 (5th Cir. 2004) (citation and quotation marks omitted). The non-movant's burden is not met by mere reliance on the allegations or denials in the non-movant's pleadings. *See Diamond Offshore Co. v. A & B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002). Likewise, "conclusory allegations" or "unsubstantiated assertions" do not meet the non-movant's burden. *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008). Instead, the non-movant must present specific facts which show the existence of a genuine issue concerning every essential component of its case. *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405 (5th Cir. 2003). In the absence of any proof, the Court will not assume that the non-movant could or would prove the necessary facts. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

Affidavits cannot preclude summary judgment unless they contain competent and otherwise admissible evidence. *See Love v. Nat'l Medical Enterprises*, 230 F.3d 765, 776 (5th Cir. 2000); *Hunter-Reed v. City of Houston*, 244 F.Supp.2d 733, 745 (S.D. Tex. 2003). A party's self-serving and unsupported statement in an affidavit will not defeat summary judgment where the evidence in the record is to the contrary. *Smith v. Southwestern Bell Tel. Co.*, 456 Fed. App'x 489, 492 (5th Cir. 2012) ("[W]e have repeatedly held that self-serving statements, without more, will not defeat a motion for summary judgment, particularly one supported by plentiful contrary evidence."); *United*

*States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001); *In re Hinsley*, 201 F.3d 638, 643 (5th Cir. 2000); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Lastly, Rule 56 does not impose upon the Court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment; evidence not referred to in the response to the motion for summary judgment is not properly before the Court, even if it exists in the summary judgment record. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). Although Levine is proceeding pro se, "the notice afforded by the Rules of Civil Procedure and the local rules" is considered "sufficient" to advise a pro se party of his burden in opposing a summary judgment motion. *Martin v. Harrison County Jail*, 975 F.2d 192, 193 (5th Cir. 1992).

### C.    Qualified Immunity

The defendants' motions invoke qualified immunity (Dkt. 14 at p. 6; Dkt. 17 at p. 4). In civil rights actions such as this one where the non-movant is suing government officials, the issue of qualified immunity alters the summary judgment analysis. *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). If the qualified immunity defense is raised, the burden shifts to the non-movant to rebut it. *Id*. All inferences are drawn in the non-movant's favor. *Id*.

The qualified immunity analysis is complex and intensely fact-specific. The Court begins by applying the two prongs of the qualified immunity defense, though the Court

may analyze the prongs out of order. The first prong is the question of whether the official's conduct violated a Constitutional right of the plaintiff. *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009). The second prong is the question of whether the Constitutional right was clearly established at the time of the violation. *Id*. For the right to have been clearly established for purposes of qualified immunity, the contours of the right must have been sufficiently clear that a reasonable official would have understood that what he was doing violated that right. *Brown v. Miller*, 519 F.3d 231, 236 (5th Cir. 2008). The unlawfulness of the official's actions must have been readily apparent from sufficiently similar situations, though there need not have been commanding precedent holding the very action in question unlawful. *Id*. at 236–37.

If the plaintiff satisfies both prongs—i.e., if the official's actions violated a clearly established Constitutional right—the Court then asks whether qualified immunity is nevertheless appropriate because the official's actions were objectively reasonable in light of law that was clearly established at the time of the disputed action. *Callahan*, 623 F.3d at 253. Whether an official's conduct was objectively reasonable is a question of law for the Court, not one of fact for the jury. *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999). An official's actions must be judged in light of the circumstances that confronted him and the facts that were available to him, without the benefit of hindsight. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989); *Callahan*, 623 F.3d at 253; *Lampkin v. City of Nacogdoches*, 7 F.3d 430, 435 (5th Cir. 1993).

Qualified immunity "establishes a high bar"—*Wyatt v. Fletcher*, 718 F.3d 496, 503 (5th Cir. 2013)—that protects "all but the plainly incompetent or those who

knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Essentially, a plaintiff must demonstrate that no reasonable official could have believed that his actions were proper. *Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994).

### III.   PRISONERS AND MEDICAL CARE

Levine seeks relief under 42 U.S.C. § 1983 for what she says was Constitutionally deficient medical care. A prisoner may succeed on a claim under 42 U.S.C. § 1983 for inadequate medical care only if she demonstrates "deliberate indifference to serious medical needs" on the part of prison officials or other state actors. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The conduct alleged must "constitute an unnecessary and wanton infliction of pain" or "be repugnant to the conscience of mankind." *Id.* at 104–06 (quotation marks omitted). A prison official acts with the requisite deliberate indifference "only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

The deliberate-indifference test has both an objective prong and a subjective one. The prisoner must first prove objective exposure to a substantial risk of serious harm. *Gobert v. Caldwell*, 463 F.3d 339, 345–46 (5th Cir. 2006). To then prove subjective deliberate indifference to that risk, the prisoner must show both: (1) that the defendant was aware of facts from which the inference of an excessive risk to the prisoner's health or safety could be drawn; and (2) that the defendant actually drew the inference that such potential for harm existed. *Farmer*, 511 U.S. at 837; *Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999). This is an "extremely high standard to meet"—*Domino v. Texas*

*Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001)—and, absent exceptional circumstances, it is not met by an incorrect diagnosis, unsuccessful medical treatment, acts of negligence, medical malpractice, or a prisoner's disagreement with his medical treatment. *Id*.; *Gobert*, 463 F.3d at 346. Rather, the prisoner must show that the defendant "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Brewster v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009) (quotation marks omitted).

"Deliberate indifference is not established when medical records indicate that the plaintiff was afforded extensive medical care by prison officials." *Brauner v. Coody*, 793 F.3d 493, 500 (5th Cir. 2015) (quotation marks and brackets omitted). The Constitution does not require that prisoners receive optimal care, and the fact that a prisoner's medical treatment "may not have been the best that money could buy" is insufficient to establish a Constitutional claim. *Mayweather v. Foti*, 958 F.2d 91 (5th Cir. 1992); *see also Gobert*, 463 F.3d at 349 ("[D]eliberate indifference exists wholly independent of an optimal standard of care."); *McMahon v. Beard*, 583 F.2d 172, 174 (5th Cir. 1978) ("[The] plaintiff stated that he had not received 'optimum' or 'best' medical treatment. Were this the legal standard, a trial of the issues might be required.").

At bottom, the deliberate-indifference standard is designed to be stringent enough to separate acts or omissions that amount to intentional choices from those that are merely unintentionally negligent oversights. *Southard v. Tex. Bd. Of Criminal Justice*, 114 F.3d 539, 551 (5th Cir. 1997). To that end, it draws on the test for "subjective

recklessness" used in criminal law, which "generally permits a finding of recklessness only when a person disregards a risk of harm of which he is aware" and does not permit such a finding based on mere "failure to alleviate a significant risk that [the person] should have perceived but did not[.]" *Farmer*, 511 U.S. at 836–40.

## IV.   LEVINE'S CLAIMS

Levine claims in her original complaint that she is legally blind in her right eye and that her surgery and post-operative care are to blame (Dkt. 1 at p. 4). She has not carried her burden of rebutting the qualified immunity defense as to any of the three defendants.

### A.   Dr. Ghorayeb

In her response to Dr. Ghorayeb's motion for summary judgment, Levine contends that Dr. Ghorayeb violated her Constitutional rights by failing to inform her that, as a hypertensive patient, she was more likely to have IFIS and was therefore at greater risk of surgical complications (Dkt. 23 at p. 5).[1] Levine claims that she would have postponed the surgery had she known about the increased risks (Dkt. 23 at p. 5). Such a claim does not arise under the Eighth Amendment; but, assuming that it is viable at all in the Fifth

---

[1]     Levine also suggests in her response that some of the medical records produced by the defendants were falsified or altered in an effort to "cover up [Dr. Ghorayeb's] mistakes" (Dkt. 23   at pp. 5–6). She presents no evidence to support these allegations, and the medical records are supported by sufficient business record affidavits (Dkt. 14-4 at p. 2; Dkt. 16 at p. 2; Dkt. 16-1 at p. 2). To the extent that Levine is objecting to the admission of her medical records as hearsay or as improperly authenticated, that objection is overruled. *See* FED. R. EVID. 803(6), 902(11); *see also United States v. Towns*, 718 F.3d 404, 409–10 (5th Cir. 2013).

Circuit, it would employ the same deliberate-indifference standard as an Eighth Amendment claim.

The Fifth Circuit has recognized that, under the Due Process Clause of the Fourteenth Amendment, a competent inmate "has a liberty interest in refusing unwanted medical treatment" as a matter of substantive due process. *Sama v. Hannigan*, 669 F.3d 585, 591 (5th Cir. 2012); *see also Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261, 278 (1990). However, the "law governing Fourteenth Amendment claims involving unwanted medical treatment in the prison context is far from certain." *Sama*, 669 F.3d at 595. And, crucially, the Fifth Circuit has never said that a medical provider's failure to provide particular information about a treatment before obtaining an inmate's consent to that treatment amounts to a Constitutional violation, so evidence showing that Dr. Ghorayeb did not inform Levine of the possible existence of IFIS does not implicate "clearly established law" for the purposes of the qualified-immunity analysis. On that basis, Levine's claims against Dr. Ghorayeb must fail. *Cf. Miller*, 519 F.3d at 238 ("By 1967, a public official's concealment of exculpatory evidence was a constitutional violation in this circuit. Therefore, the law was sufficiently clear in 1984 that a state crime lab technician would have known that suppression of exculpatory blood test results would violate a defendant's rights.").

That said, the Court notes that other circuits have evidently recognized an informed-consent right. *See Pabon v. Wright*, 459 F.3d 241, 250 (2d Cir. 2006); *Benson v. Terhune*, 304 F.3d 874, 884–85 (9th Cir. 2002); *White v. Napoleon*, 897 F.2d 103, 113 (3d Cir. 1990). Even so, the clearest standard the Court could find, the one articulated by

the Second Circuit in its *Pabon* opinion, sets a bar that Levine cannot clear. Under *Pabon*, "[t]o establish a violation of the constitutional right to medical information, a prisoner must satisfy an objective reasonableness standard, must demonstrate that the defendant acted with the requisite state of mind, and must make a showing that the lack of information impaired his right to refuse treatment." *Pabon*, 459 F.3d at 250. The "objective reasonableness" standard only requires a doctor to "provide a prisoner with such information as a reasonable patient would find necessary to making an informed decision regarding treatment options" and does not require the doctor to provide the prisoner with "an exhaustive list of all the possible adverse effects of each aspect of his treatment." *Id*. The "requisite state of mind" is, at a minimum, deliberate indifference— "simple negligence will not suffice." *Id*. at 251.

Levine provides no evidence that Dr. Ghorayeb acted with deliberate indifference. First, Levine was specifically warned by UTMB's consent form, which she signed, that she might experience pain, infection, bleeding, loss of vision, and a host of other adverse effects as a result of the cataract surgery (Dkt. 16-1 at p. 56). Dr. Ghorayeb discussed the consent form with Levine (Dkt. 16-1 at pp. 13, 56). Furthermore, Dr. Ghorayeb's operative report indicates that he discussed "[t]he risks, benefits and alternatives of cataract surgery" with Levine and even advised her "that she could wait for the cataract surgery" (Dkt. 16-1 at p. 13). Levine "voiced understanding and wished to proceed" (Dkt. 16-1 at p. 13). Levine does not contradict this account. The extensive warnings provided by the consent form and Dr. Ghorayeb's advice regarding alternatives to cataract surgery and the option of delaying the surgery demonstrate that any failure to discuss IFIS

resulted from, at most, negligence, and not deliberate indifference.[2] "[N]egligence is categorically insufficient to deprive someone of substantive due process protection." *Sama*, 669 F.3d at 594; *see also Pabon*, 459 F.3d at 250 ("Inadvertent failures to impart medical information cannot form the basis of a constitutional violation."). Even proof of gross negligence does not establish deliberate indifference. *Whitley v. Hanna*, 726 F.3d 631, 641 (5th Cir. 2013) (pointing out that gross negligence is "a heightened degree of negligence" while deliberate indifference is "a lesser form of intent") (quotation marks omitted). To recover under either the Eighth Amendment or the Fourteenth Amendment, Levine must point to competent summary judgment evidence showing that Dr. Ghorayeb knowingly exposed her to and consciously disregarded a substantial risk of serious harm. *Brewer v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009). She has not done so.

### B.     Dr. Taylor and Knoth

---

[2]      The Court doubts that Dr. Ghorayeb's failure to mention the possibility of IFIS even rises to the level of negligence. Dr. Ghorayeb's medical expert testified that IFIS "cannot be predicted or prevented prior to surgery" (Dkt. 14-1 at p. 3). Indeed, as noted above, IFIS first appeared in the medical literature in 2005, and a very recent article in the journal *Current Opinion in Ophthalmology* notes that the medical community's "understanding of additional medications and medical conditions involved in IFIS is . . . evolving[.]" Enright JM, Karacal H, Tsai LM. Floppy Iris Syndrome and Cataract Surgery. Curr Opin Ophthalmol 2017 Jan; 28(1): 29–34. Although some medical literature has shown a link between hypertension and IFIS, it appears that the first discussion of such a link was published in 2011, the year after Levine's surgery. Chatziralli IP, Sergentanis TN. Risk factors for intraoperative floppy iris syndrome: A meta-analysis. Ophthalmol 2011; 118: 730–735. And in fact, at the time of Levine's surgery, at least one medical journal article had concluded that there was *not* a connection between hypertension and IFIP. Altan-Yaycioglu R, Gedik S, Pelit A, Akova YA, Akman A. Clinical factors associated with floppy iris signs: a prospective study from two centers. Ophthalmic Surg Lasers Imaging 2009 May–Jun; 40(3): 232–238.

Levine did not file a formal response to the motion for summary judgment filed by Dr. Taylor and Knoth. In effect, this means that she has presented no summary judgment evidence. Even a *pro se* plaintiff must specifically refer to evidence in the summary judgment record in order to put that evidence properly before the court. *Outley v. Luke & Associates, Inc.*, 840 F.3d 212, 217 (5th Cir. 2016). The Court will nevertheless examine Levine's original complaint and its attachments because she declared under penalty of perjury that the facts set forth in those documents were true and correct. However, those documents contain no evidence of deliberate indifference beyond self-serving, unsupported statements.

The record reflects that Dr. Taylor only saw Levine at one clinic visit, regarding a complaint of eye pain, and never heard about any medical complaints from her after that (Dkt. 16 at pp. 13, 82). Levine only complained of eye pain at CYMF once after Dr. Taylor saw her, and that complaint came on the same day as a follow-up appointment at UTMB, so she was just taken there (Dkt. 16 at p. 82). Levine's complaints against Dr. Taylor are that he "took it upon himself to deny her one of the ordered drops" that UTMB had prescribed, leaving her with "nothing but Tylenol for pain[;]" did not conduct an extensive enough examination of her right eye; and caused her to miss her June 24, 2010 follow-up appointment at UTMB (Dkt. 1-6 at p. 7). It is unclear which prescription Levine is accusing Dr. Taylor of discontinuing, but her Vigamox prescription was discontinued by UTMB providers, not by Dr. Taylor (Dkt. 16 at p. 26). Dr. Taylor's orders were actually to continue Levine's eyedrops as prescribed by UTMB (Dkt. 16 at p. 13). Regardless, the discontinuation, without more, would not be evidence of deliberate

indifference. *See Domino*, 239 F.3d at 756 ("[T]he decision whether to provide additional treatment is a classic example of a matter for medical judgment.") (quotation marks omitted). Nor is the fact that Dr. Taylor conducted only a funduscopic examination of Levine's right eye. The funduscopic examination was unremarkable, and Levine did not voice any more complaints until July 5, when she was taken to UTMB for a follow-up appointment (Dkt. 16 at pp. 13, 82). There is no evidence that Dr. Taylor was deliberately indifferent to the inadequacy of the funduscopic examination as a diagnostic measure, even assuming that it was inadequate. There is also no evidence that Levine's missing her June 24 follow-up appointment at UTMB was at all the fault of Dr. Taylor. CYMF records indicate that she was chained out to UTMB, and there is no indication that the missed appointment was anything other than a negligent scheduling mishap. Levine made it to two other follow-up appointments, on July 5 and July 12.

Like Dr. Taylor, Knoth also only saw Levine at one clinic visit regarding a complaint of eye pain (Dkt. 16 at pp. 14, 82). Levine accuses Knoth of "t[aking] away one of her drops" and telling her, "We don't have to do anything for you, your [sic] not one of ours" (Dkt. 1-6 at p. 8). Levine appears to be confused again: only one of her prescriptions was discontinued, and that was on the orders of UTMB personnel (Dkt. 16 at p. 26). Levine also alleges that Knoth took the drops and made the statement "after her [UTMB] appointment of 7/5/2010" (Dkt. 1-6 at p. 8), but there is no record of Knoth seeing Levine after her July 5 follow-up at UTMB. Notably, the July 5 follow-up is when Levine's Vigamox prescription was discontinued (Dkt. 16 at pp. 25, 26, 27), so if Knoth took away an eyedropper after that date it was likely pursuant to the discontinuation.

Levine presents no evidence showing otherwise. As for Knoth's alleged statement, it could, viewed in the light most favorable to Levine, be seen as a threat to deny her medical treatment. However, there is no evidence that Knoth did anything to follow through on that threat, and mere threats do not amount to a Constitutional violation. *See Bender v. Brumley*, 1 F.3d 271, 274 n. 4 (5th Cir. 1993); *McFadden v. Lucas*, 713 F.2d 143, 146 (5th Cir. 1983). Levine missed her June 24 follow-up appointment at UTMB, but that happened before Knoth allegedly made this statement. In any event, there is no evidence that Knoth had anything to do with Levine missing the appointment.

The defendants are entitled to qualified immunity, and their motions for summary judgment are granted.

## V.    <u>CONCLUSION</u>

Based on the foregoing, the Court **ORDERS** as follows:

1. The defendants' motions for summary judgment (Dkt. 14 and Dkt. 17) are **GRANTED**, and all claims against them are dismissed with prejudice.

2.       Any other pending motions are **DENIED** as moot.

The Clerk is directed to provide a copy of this order to the parties and to *amicus* counsel.

SIGNED at Galveston, Texas, this 31st day of March, 2017.

George C. Hanks Jr.
United States District Judge